Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL (VI)

| PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>MACDARA GREENNOUGH FLAHERTY<br><br>Apelante | KLAN202400274 | APELACIÓN Procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Criminal núm.: D BD2023G0005, D IC2022MOO39, D OP2022M0035, D DC2022M0041<br><br>Sobre: Art. 199 (B) C.P.; Art. 170 C.P.; Art. 241 (A) C.P.; Tent. Art. 108 C.P. |

Panel integrado por su presidenta la jueza Ortiz Flores, el juez Rivera Torres, la jueza Rivera Pérez y el juez Campos Pérez.

**Rivera Torres, Juez Ponente**

### SENTENCIA

En San Juan, Puerto Rico, a 17 de diciembre de 2024.

Comparece ante este Tribunal de Apelaciones, el Sr. Macdara Greennough Flaherty (el apelante o el señor Greennough Flaherty) mediante el escrito de *Apelación* de epígrafe solicitándonos que revoquemos la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de Bayamón (TPI), el 22 de febrero de 2024, archivada en autos al día siguiente. Mediante dicho dictamen, el foro primario declaró culpable al apelante por infracción a los delitos imputados. Por lo que, se le impuso una condena total de dos (2) años y seis (6) meses de prisión, más el pago de la pena especial ascendente a $600. Las penas fueron impuestas a cumplirse de manera concurrente.

Por los fundamentos que expondremos a continuación, se confirma el dictamen apelado.

**I.**

Por hechos acaecidos el 25 de noviembre de 2022, en horas de la noche, en el Municipio de Dorado, el Ministerio Público presentó unas denuncias contra el señor Greennough Flaherty por infringir el Artículo 170 (*Violación de Morada*); Artículo 199 (*Daño Agravado*); Artículo 241 (*alteración a la paz*); y tentativa del Artículo 108 (*agresión*), del Código Penal de 2012.

Luego de los trámites procesales pertinentes, y aceptada la renuncia a juicio por jurado, los días 2 de octubre, 28, 29 y 30 de noviembre de 2023, se celebró el juicio en su fondo. El Ministerio Público presentó como testigos a la Sra. Monika Gilmore (residente de la Urbanización Dorado Beach núm. 357); al Sr. Brian Castillo (oficial de seguridad de St. James); y el Agte. Juan José Collazo Rolón (adscrito al Distrito de Dorado). La defensa, por su parte, presentó como testigo a la Dra. Cynthia Casanova Pelosi, psiquiatra con subespecialidad en psiquiatría forense.

A continuación, consignamos un breve resumen de los testimonios vertidos:

> De entrada, destacamos que **se estipuló el testimonio** del Sr. Lucio Base en cuanto a que es el dueño de la residencia donde ocurrieron los hechos, es decir, la Urbanización Dorado Beach Núm. 357. **Adquirió la propiedad el 28 de febrero de 2022 por compraventa a la Sra. Sarah Greene, quien es la madre de acusado**. Se estipuló además que él fue la persona que extrajo los videos de las cámaras de seguridad de la residencia y los del celular, y los entregó al Ministerio Público. Incluso se estipuló que los daños causados sobrepasan los $560.[1]

> La <u>Sr. Monika Gilmore</u> declaró, en el idioma inglés, que su prometido es el Sr. Lucio Base y que reside junto a este en la Urbanización Dorado Beach Núm. 357 desde el 28 de febrero de 2022.[2] El 25 de noviembre de 2022 a las 10:00 pm estaba sola en la casa viendo televisión, su prometido se encontraba en New York, cuando escuchó un ruido y salió corriendo a la parte de atrás de la casa y llamó a la seguridad de Dorado Beach.[3] Declaró que al cruzar por el cuarto se percata que hay un hombre medio desnudo que iba atacarla.[4]

---

[1] Véase, Transcripción de la Prueba Oral (TPO) del 28 de noviembre de 2023, a las págs. 12-14.
[2] *Íd.*, a la pág. 47.
[3] *Íd.*, a las págs. 48-51.
[4] *Íd.*, a la pág. 53.

Identificó en sala al acusado.[5] Una vez llega la seguridad, lo restringieron, forcejearon y trató de escaparse.[6] Testificó que el acusado le gritaba que la iba a matar, y le gritó puta.[7] El acusado se les escapa a los de seguridad y vuelve a entrar en la casa.[8] En la sala de la residencia el acusado estaba golpeando con un objeto grande a uno de los de seguridad.[9] Una hora después seguía gritando puta y bicha, y que la mataba si podía, hasta que llegó la Policía y lo arrestaron.[10] A la testigo le fueron mostrados los videos de las cámaras de seguridad y los de su celular. Enfatizó que nunca lo invitó a entrar al hogar.

Durante el contrainterrogatorio, se le realizaron preguntas relacionadas a los visuales. Esta indicó que no vio al acusado romper la puerta de la terraza, que eso lo vio en el video.[11] También señaló que el señor Greennough Flaherty la identificó incorrectamente y que este tenía una botella de vino en la mano la cual ellos no la habían comprado.[12] Además, surge de uno de los videos cuando esta le indica; "*you broke into my house*".[13] Señaló que el acusado no estaba en sus cabales (*buen estado de mente*), *estaba influenciado por drogas o alcohol, claramente estaba bebiendo, estaba borracho.*[14]

El <u>Sr. Brian Castillo</u>, Oficial de Seguridad de St. James Security, declaró que al llegar a la residencia encontraron vidrios en el piso, puertas rotas, al acusado en la sala y les dijo que él era el dueño.[15] Testificó que este se encontraba agresivo.[16] Durante el contrainterrogatorio indicó que el señor Greennough Flaherty estaba bajo los efectos de alguna sustancia.[17]

El <u>Agente de la Policía, el Sr. José Collazo Rolón</u>, testificó que recibió una llamada sobre posible escalamiento.[18] Al llegar a la residencia, encontró que el acusado ya estaba afuera, (lo identificó en sala).[19] Lo arrestaron y entrevistó a Monika. El señor Greennough Flaherty fue llevado al CDT de Dorado ya que esta tenía unas cortaduras en la cabeza y en el rostro.[20] Declaró que el acusado estaba en estado de embriaguez.[21]

Durante el contrainterrogatorio testificó que luego de más de ocho (8) horas, que estuvo con el señor Greennough Flaherty, este cambió su comportamiento y la forma de expresarse. Además, manifestó que los oficiales de St. James Security le informaron que este les indicó que creía que estaba en su casa.[22]

---

[5] *Íd.*, a la pág. 55
[6] *Íd.*, a las págs. 54 y 57.
[7] *Íd.*, a la pág. 57.
[8] *Íd.*, a la pág. 58.
[9] *Íd.*, a la pág. 59.
[10] *Íd.*, a las págs. 68, y 71.
[11] *Íd.*, a las págs. 105-106.
[12] *Íd.*, a las págs. 126, 129 y 131.
[13] *Íd.*, a la pág. 140.
[14] *Íd.*, a las págs. 144-146, TPO del 29 de noviembre de 2023, a las págs. 13 y 123-124.
[15] *Íd.*, a las págs. 139, 140-141.
[16] *Íd.*, a la pág. 142
[17] *Íd.*, a la pág. 150.
[18] Véase, TPO del 30 de noviembre de 2023, a la pág. 9
[19] *Íd.*, a la pág. 11.
[20] *Íd.*, a la pág. 16.
[21] *Íd.*, a la pág. 17.
[22] *Íd.*, a las págs. 19, 20 y 21.

La Dra. Cynthia Casanova Pelosi fue cualificada como perito en psiquiatría forense. Esta declaró sobre los hallazgos que fueron consignados en su informe el cual se marcó como Exhibit 1 de la Defensa. Testificó que el acusado sufrió de amnesia alcohólica (síndrome serotoninérgico) por lo cual no tiene recuerdos desde las 9:30 pm hasta las 2:00 am.[23] En su opinión el acusado se encontraba intoxicado al momento de los hechos.[24]

Durante el contrainterrogatorio indicó que el señor Greennough Flaherty recuerda todo lo que bebió durante el día pero que al salir del restaurante ocurrió el *apagón alcohólico*, la *amnesia alcohólica*.[25]

Aquilatados los testimonios, así como la prueba presentada, el TPI emitió un fallo de culpabilidad por todos los delitos imputados. El 22 de febrero de 2024, se dictó una *Sentencia* imponiendo las siguientes penas, a cumplirse concurrentes entre sí:

- Artículo 199 (B)- 2 años y 6 meses de prisión aplicando atenuantes conforme a los Artículos 65 (B) y 67 del Código Penal.
- Artículo 170 – 6 meses de prisión
- Artículo 241- 6 meses de prisión
- Tent. Artículo 108 – 3 meses de prisión

Asimismo, el foro apelado impuso el pago de la pena especial por $300 en el caso grave, y en los menos graves $100 en cada cargo.

Inconforme, el apelante acude ante este foro intermedio imputándole al TPI la comisión de los siguientes errores:

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL CONDENAR AL APELANTE POR LOS DELITOS IMPUTADOS A PESAR DE QUE LA PRUEBA NO ESTABLECIÓ TODOS LOS ELEMENTOS CONSTITUTIVOS REQUERIDOS.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL CONDENAR AL APELANTE POR LOS DELITOS IMPUTADOS A PESAR DE QUE LA PRUEBA ESTABLECIÓ LAS CAUSAS DE EXCLUSIÓN DE RESPONSABILIDAD PENAL Y QUE EL APELANTE ACTUÓ POR ERROR SOBRE LOS ELEMENTOS DE LOS DELITOS.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL CONCLUIR QUE EL APELANTE NO SE ENCONTRABA INTOXICADO AL MOMENTO EN QUE OCURRIERON LOS HECHOS EN QUE SE BASARON LOS DELITOS IMPUTADOS.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DESCARTAR EL TESTIMONIO INCONTROVERTIBLE DE LA PSIQUIATRA FORENSE QUE PRESENTÓ LA DEFENSA Y QUE ESTABLECIÓ EL

---

[23] *Íd.*, a las págs. 55-56.
[24] *Íd.*, a las págs. 57, 58, 65.
[25] *Íd.*, a las págs. 72, 78.

ESTADO MENTAL DEL APELANTE AL MOMENTO DE LA OCURRENCIA DE LOS HECHOS.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL CONDENAR AL APELANTE A PESAR DE QUE LA PRUEBA PRESENTADA NO ESTABLECIÓ LA COMISIÓN DE LOS DELITOS IMPUTADOS MÁS ALLÁ DE DUDA RAZONABLE.

Luego de varias prórrogas concedidas, el 20 de junio de 2024, el apelante presentó la Transcripción de la Prueba Oral (TPO) estipulada. El 9 de septiembre de 2024, la parte apelante presentó su escrito intitulado *Alegato de Apelación Criminal.* Posteriormente, y luego de una prórroga concedida, el 29 de octubre de 2024 la Oficina del Procurador General (el Procurador) presentó su alegato en oposición.[26] Así, nos damos por cumplidos, y a su vez decretamos perfeccionado el recurso.

Analizados los escritos de las partes, la TPO y el expediente apelativo; así como estudiado el derecho aplicable, procedemos a resolver.

## II.

**La acción penal**

El Código Penal del 2012 se adoptó mediante la Ley núm. 146-2012, 33 LPRA sec. 5001, *et. seq.* Este código ha sido enmendado en variadas ocasiones, siendo la más significativa las incorporadas a través de la Ley núm. 246- 2014. De esta manera fueron incluidos a nuestro ordenamiento las tres distintas formas o modalidades de la intención.

El Artículo 21 del Código Penal de 2012, 33 LPRA sec. 5034, establece las formas de culpabilidad y el requisito general del *elemento subjetivo* de la siguiente manera:

(a) Una persona solamente puede ser sancionada penalmente si actuó a propósito, con conocimiento, temeraria o negligentemente con relación a un resultado o circunstancia prohibida por ley.

---

[26] El apelante acompañó su alegato con una moción en solicitud de autorización para presentar en exceso del límite de páginas permitidas por nuestro reglamento, la cual declaramos ha lugar.

(b) El elemento subjetivo del delito se manifiesta por las circunstancias relacionadas con el hecho, la capacidad mental, las manifestaciones y conducta de la persona.

Los *elementos subjetivos* de la ofensa se conocen tradicionalmente como *mens rea* (mente culpable). Lo cual tiene que ver con el análisis del estado mental culpable que debe tener el sujeto para ser castigado por la comisión de un delito. Al respecto, el Profesor Luis E. Chiesa Aponte, nos comenta que "[l]os principales estados mentales culpables son dos: intención y negligencia."[27]

Destaca, además, y citamos:

"A grandes rasgos, existen tres distintas formas o modalidades de la intención: (1) propósito, (2) conocimiento y (3) temeridad. En términos generales, un sujeto actúa a "propósito" cuando su objetivo es cometer el delito. De otra parte, el autor actúa "con conocimiento" cuando sabe que la comisión del delito es una consecuencia necesaria de sus actos. Por otro lado, un sujeto actúa "temerariamente" cuando es consciente de que una conducta crea un riesgo injustificado de producir un delito. En relación con este último concepto, es importante aclarar que me refiero a "temeridad" como sinónimo de "recklessness" del Código Penal Modelo. Se trata de una modalidad de la intención. No hago referencia, por tanto, a la "temeridad" en el sentido de una forma agravada de negligencia."[28]

El Artículo 14 del Código Penal del 2012, 33 LPRA sec. 5014, en sus incisos (a) y (kk) define los *elementos subjetivos* de a *sabiendas*, y *propósito* como sigue:

"A sabiendas" es sinónimo de "con conocimiento", según definido en el Artículo 22(2) de este Código. Actuar "a sabiendas" **no requiere el conocimiento de la ilegalidad del acto u omisión**. Términos equivalentes como: "conocimiento", "sabiendo", "con conocimiento" y "conociendo" tienen el mismo significado.

"Propósito" Una persona actúa a propósito cuando el **objetivo consciente de la persona es cometer el delito**. Términos equivalentes como "a propósito", "con el propósito", "concebido", "preconcebido" y "diseñado" tienen el mismo significado. [Énfasis nuestro]

En cuanto a estas modalidades de *elementos subjetivos,* el Artículo 22, *supra*, 33 LPRA sec. 5035, dispone:

(1) A propósito

---

[27] Chiesa Aponte, *Derecho Penal Sustantivo*, 2da ed., Estados Unidos, Publicaciones JTS, 2013, a la pág. 151.
[28] [Nota alcalce omitida]. Chiesa Aponte, op. cit., a las págs. 152-153.

> (a) con relación a un resultado, una persona actúa "a propósito" cuando **su objetivo consciente es la producción de dicho resultado**.
> (b) con relación a una circunstancia, una persona actúa "a propósito" **cuando la persona cree que la circunstancia existe**.
>
> (2) Con conocimiento
> (a) con relación a un resultado, una persona actúa "con conocimiento" cuando está consciente de que la producción del resultado **es una consecuencia prácticamente segura de su conducta**.
> (b) con relación a un elemento de circunstancia, una persona actúa "con conocimiento" cuando está consciente de que la existencia de la circunstancia es prácticamente segura.

De lo anterior se resume que actúa intencionalmente: quien tiene como objetivo consciente la realización del hecho delictivo, quien prevea que la producción del resultado prohibido es una consecuencia natural o altamente probable de su conducta, y quien prevee o es consciente de que existe una alta probabilidad de que mediante su conducta se produzca el hecho delictivo. Chiesa Aponte, op. cit., a las págs. 168-169.

En cuanto a la intención, el Profesor Chiesa comenta lo siguiente: [29]

> La intención contiene elementos cognoscitivos ("conocer" las circunstancias concomitantes que convierten a la acción en delictiva). El aspecto volitivo de la intención no implica un "querer" en el sentido ordinario de la palabra. Es decir, **no es necesario que el sujeto "tenga el propósito de producir determinado resultado** para que se estime que actuó "intencionalmente" en sentido penal. En muchos casos, basta con que el autor haya previsto que su acción probablemente produciría un delito para que se considere que medió intención de su parte. [Énfasis nuestro]

Además, apuntalamos que hay delitos que requieren *elementos subjetivos* adicionales a la intención. En estos casos, "es la intención del autor de realizar un acto ulterior." Chiesa Aponte, op. cit., a la pág. 172.  Por lo cual, existen ofensas en las cuales este segundo elemento requiere un estado mental distinto como lo son, por ejemplo, el delito de escalamiento, actos lascivos y asesinato en primer grado. *Íd.*, a las págs. 174-175.

---

[29] Chiesa Aponte, op. cit., a la pág. 152.

De otra parte, están los *elementos objetivos* del tipo o delito. El tipo comprende la conducta prohibida por el legislador en la ley que a su vez contiene o puede contener tres distintos elementos, a saber: (1) los de conducta (comportamiento), (2) lo de resultado, y (3) los que describen circunstancias (denominadas circunstancias concomitante). *Íd.*, a las págs. 118 y 152.

En resumen, los elementos de conducta describen la acción física prohibida; los de resultado describen una consecuencia prohibida por la ley penal; y los que requieren que concurran a la acción y/o el resultado <u>una circunstancia adicional</u> para que el acto sea delito. *Íd.*, a la pág. 118.

Por tanto, "[u]n sujeto solamente puede actuar "a propósito" en relación con los elementos de la ofensa que tienen que ver con la conducta o el resultado prohibido. Solo puede tener como "objetivo consciente" llevar a cabo determinada acción (como por ejemplo "penetrar" a la mujer en el delito de violación) o producir un resultado particular (como ejemplo, "matar" a un ser humano en el delito asesinato). Sin embargo, no se puede tener como "propósito" que exista determinada circunstancia concomitante. Las circunstancias concomitantes (como, por ejemplo, la "ajenidad" de la cosa en el delito de apropiación ilegal), **son situaciones de hecho** que "existen" o "no existen". Por ende, el sujeto solamente puede tener o no conocimiento de la existencia de dichas circunstancias, mas no puede tener como "propósito" o como "su objetivo consciente" su existencia."[30]

**Los delitos del Código Penal de 2012**

En lo aquí pertinente, nuestro Código Penal tipifica los delitos imputados en el caso de epígrafe de la siguiente manera.

---

[30] [Nota al calce omitida] [Énfasis nuestro]. Chiesa Aponte, op. cit., a las págs. 153-154.

El Artículo 198, 33 LPRA sec. 5268, dispone el delito de *Daños* como:

> Toda persona que **destruya**, inutilice, altere, desaparezca o cause deterioro a **un bien mueble o un bien inmueble ajeno**, total o parcialmente, incurrirá en delito menos grave.
>
> El tribunal también podrá imponer la pena de restitución.

A su vez, el Artículo 199, 33 LPRA sec. 5269, establece como *Daño Agravado* lo siguiente:

> Será sancionada con pena de reclusión por un término fijo de tres (3) años, toda persona que cometa el delito de daños en el Artículo 198 de este Código, si concurre cualquiera de las siguientes circunstancias:
> (a)…
> (b) cuando el daño causado es de **quinientos (500) dólares** o más;
> (c) …
> (d) …
> (e) ….
> Si la persona convicta en la modalidad de delito grave es una persona jurídica será sancionada con pena de multa hasta diez mil dólares ($10,000).
> El tribunal también podrá imponer la pena de restitución.

En cuanto al delito de *Violación de Morada*, el Artículo 170, 33 LPRA sec. 5236, preceptúa:

> Toda persona **que se introduzca o se mantenga en una casa o edificio ocupado ajeno**, en sus dependencias o en el solar en que esté ubicado**, sin el consentimiento o contra la voluntad expresa del morador** o de su representante, o que penetre en ella clandestinamente o con engaño, incurrirá en delito menos grave. [Énfasis nuestro]

A su vez, el delito de *alteración a la paz*, Artículo 241 inciso (A), 33 LPRA sec. 5331, se configura cuando:

> …, toda persona que realice cualquiera de los siguientes actos:
>
> (a) **perturbe la paz o tranquilidad de una o varias personas con conducta ofensiva que afecte el derecho a la intimidad en su hogar**, o en cualquier otro lugar donde tenga una expectativa razonable de intimidad;
> (b) perturbe la paz o tranquilidad de una o varias personas **mediante palabras o expresiones ofensivas o insultantes** al proferirlas **en un lugar** donde quien las oye tiene una expectativa razonable de intimidad;
> (c) o perturbe la paz o tranquilidad de una o varias personas en forma estrepitosa o inconveniente

mediante **vituperios, oprobios, desafíos, provocaciones, palabras insultantes o actos que puedan provocar una reacción violenta o airada en quien las escucha**. [Énfasis nuestro]

Dicho precepto mantuvo en esencia la misma redacción que el Artículo 247 del Código de 2004. La primera modalidad descrita en el inciso (a) consiste en la perturbación a la paz de una o varias personas **con conducta que afecte el derecho a la intimidad de la persona en el hogar**. En la segunda modalidad descrita en el inciso (b) consiste en perturbar la tranquilidad de una o varias personas **mediante palabra o expresiones ofensivas o insultantes** profiriéndolas en un lugar donde quien las oye tiene una expectativa razonable de intimidad.

En lo que respecta a los elementos del delito de alteración a la paz, el primero es, que **la víctima se encuentre en paz al momento de la comisión del delito**. Seguidamente, en cuanto a la segunda modalidad, se requiere que la parte acusada inicie y dirija **los insultos al perjudicado** y que, a causa de esos insultos, la paz o tranquilidad del perjudicado sea efectivamente alterada. Para analizar si la paz de la parte perjudicada fue alterada, hay que considerar si el lenguaje utilizado por el acusado es capaz de ocasionar una reacción violenta inmediata.[31] Destacamos que susceptibilidad (reacción) no es elemento integrante del delito.[32]

Por su parte, el Artículo 35 del referido cuerpo legal, 33 LPRA sec. 5048, define la tentativa "... cuando la persona actúa **con el propósito** de producir el delito o **con conocimiento** de que se producirá el delito, y la persona realiza acciones inequívoca e inmediatamente dirigidas a la consumación de un delito que no se consuma por circunstancias ajenas a su voluntad." [Énfasis nuestro] A su vez, *la agresión* se establece cuando "[t]oda persona

---

[31] Véase, *Pueblo v. Casillas, Torres*, 190 DPR 398, 425 (2014); *Pueblo v. García Colón I*, 182 DPR 129, 157-158 (2011); *Pueblo v. De León Martínez*, 132 DPR 746, 767-768 (1993).
[32] Véase, *Pueblo v. Caro González*, 110 DPR 518, 536-537 (1980).

que ilegalmente, por cualquier medio o forma, cause a otra una lesión a su integridad corporal, incurrirá en delito menos grave." Artículo 108, 33 LPRA sec. 5161.

**El error de tipo**

El "error de tipo" ocurre cuando el autor erradamente cree que mediante su conducta no está ejecutando uno de los elementos del *tipo* penal."[33] El Artículo 29 del Código Penal de 2012, 33 LPRA sec. 5042, regula el *error de tipo* como sigue:

> **No incurre en responsabilidad penal** la persona cuyo hecho responde **a un error acerca de un elemento del delito que excluye** el propósito, conocimiento, temeridad o negligencia requerido por el delito imputado. Cuando se trate de delitos cuyo elemento mental es la temeridad, el error no excluye responsabilidad si se debió a la temeridad del sujeto. Cuando se trate de delitos cuyo elemento mental es la negligencia, el error no excluye responsabilidad si se debió a la negligencia o temeridad del sujeto. Si el error recae sobre una circunstancia agravante o que dé lugar a una modalidad más grave del delito, impedirá la imposición de la pena más grave. [Énfasis nuestro]

En cuanto a este artículo, el Profesor Chiesa Aponte comenta que:

> "... dicho artículo reconoce que el error de tipo excluye la intención, pues en estos supuestos, el sujeto "no sabe lo que hace" y, por consiguiente, desconoce que mediante su conducta está ejecutando un hecho delictivo. No puede afirmarse que actúa con intención quien, debido a un error de tipo, desconoce que su conducta satisface los elementos de una ofensa." Chiesa Aponte, op. cit., a la pág. 178.

Destacamos que, en *Pueblo v. Carmona, Rivera*, 143 DPR 907 (1997), previo a la vigencia del presente código, nuestro alto foro expresó que, para solicitar con éxito este eximente de responsabilidad penal, hay que demostrar que el error es esencial e invencible:

> Es esencial cuando puede clasificarse como error sobre el tipo o error de prohibición. **El error sobre el tipo es aquel que recae sobre los elementos constitutivos del delito**. El error de prohibición se refiere a una creencia equivocada de que se está actuando conforme con la ley o a una causa de justificación que en realidad no existía. *Íd.*, a la pág. 916 citando a *Pueblo v. Ruiz Ramos*, 125 DPR 365, 394 (1990).

---

[33] [Itálica en el original]. *Íd.*, a la pág. 179.

En cuanto al requerimiento de que el error sea invencible se refiere a cuando **no se podía evitar** a pesar de que el actor ejerció el cuidado debido.

> Cuando el error es vencible o se debe a imprudencia por no ejercer el debido cuidado, la persona no estará exenta de responsabilidad, **sino que responderá penalmente, de existir un delito a título de negligencia** que corresponda a su conducta. Nevares Muñiz, *Código Penal de Puerto Rico*, San Juan, Instituto para el Desarrollo del Derecho, Inc., Ed. 2013, a la pág. 61.

El error de tipo puede referirse a cualquiera de las circunstancias concomitantes que formen parte del elemento objetivo del tipo delictivo, ya sean de naturaleza descriptiva (los que distinguen con los sentidos, por ejemplo, de noche, o valor mayor de $500) o normativa (los que requieren valoración jurídica, por ejemplo, ajenidad o bienes públicos).[34]

En otras palabras, la persona que actúa bajo un error de tipo conoce lo que está prohibido, pero no comprende o no se da cuenta de que está incurriendo en esa conducta.[35] Los criterios para determinar la razonabilidad o no del error son las circunstancias del hecho y las circunstancias personales del autor. *Íd.*

**La intoxicación voluntaria**

El Artículo 42 del Código Penal de 2012, 33 LPRA. sec. 5065, dispone:

> La voluntaria intoxicación por drogas, sustancias narcóticas, estimulantes o deprimentes, o sustancias similares **no es admisible** para establecer que la persona se encontraba en un estado de inimputabilidad o para negar que la persona intoxicada actuó temeraria o negligentemente.
> No obstante, un estado de intoxicación voluntaria **es admisible para negar que la persona intoxicada actuó a propósito o con conocimiento.**

Comenzamos indicando que, conforme a lo dispuesto en la referida norma, la prueba sobre intoxicación voluntaria solamente **es admisible** cuando se le imputa al acusado un delito de intención

---

[34] Oscar E. Miranda Miller, *El (limitado) rol de la falta de consentimiento en el delito de agresión sexual*, 84 REV. JUR. UPR 413 (2015), a la pág. 435-436.
[35] *Íd.*

bajo las modalidades de *a propósito* o *con conocimiento*. "No constituye una causa de inimputabilidad, sino una defensa mediante la cual se puede negar **un elemento subjetivo de la ofensa**: la **intención específica**. Sin embargo, no puede determinarse, mediante una lectura de esta disposición, si la prueba de intoxicación sirve para negar una "intención específica" en el sentido de "propósito" o "conocimiento" como firmas de la intención o en el sentido de un estado mental adicional a la intención. No obstante, me parece que de un análisis de la jurisprudencia de nuestro Tribunal Supremo **se puede colegir que dicha prueba es admisible**, si pretende utilizarse para negar la existencia de una "intención específica" en el sentido de un **elemento subjetivo distinto a la intención**." [Énfasis nuestro]. Chiesa Aponte, op. cit., a las págs. 185-186. Añade el tratadista que "[p]or el contrario, la prueba no es admisible cuando el delito imputado es de **intención general**, en el sentido de que para su consumación **no es necesario constatar que al realizase la acción el sujeto albergaba un estado mental adicional a la intención**." [Énfasis nuestro]. *Íd.*

Asimismo, entendemos importante destacar que la Profesora Dora Nevares-Muñiz expresa que "cuando el delito es uno de intención específica… la intoxicación podría operar como causa de inimputabilidad en cuanto a ese delito …". Nevares Muñiz, *Derecho Penal Puertorriqueño*, Parte General, Instituto para el Desarrollo del Derecho, Inc., 5ta Ed. 2005, a la pág. 321. Al Profesor Chiesa Aponte dicha conclusión le parece equivocada por cuanto entiende que la intoxicación voluntaria "no funciona como causa de inimputabilidad sino como un mecanismo para negar la existencia de un elemento del delito: la intención específica. Por ende, estamos ante lo que el profesor Paul Robinson llama un *absent element defense*, y no ante un *excuse* como parece sugerir la profesora Nevares." Chiesa Aponte, op. cit., nota al calce 72, a las págs. 185-186.

De otra parte, la jurisprudencia previa a la aprobación del código penal vigente, interpretando un artículo similar al presente, indicaba que, aunque la defensa de intoxicación voluntaria **no constituye un eximente de responsabilidad criminal**, sí puede ser utilizada **para reducir el grado del delito** de ser la misma probada eficazmente. *Pueblo v. Belmonte Colón*, 106 DPR 82, 88 (1977). Además, este hecho se debe demostrar con peritos médicos y sicólogos. *Íd.*, a la pág. 86. La prueba debe evidenciar que la embriaguez voluntaria **fue de tal grado o carácter que inhiba en el acusado su facultad mental para formar la intención específica** requerida por el Código para la convicción de un delito —o grado del mismo— en el cual **se requiera tal intención específica**. *Pueblo v. Rivera*, 70 DPR 570, 573 (1949).[36] Por tanto, es evidente que **la mera prueba** sobre embriaguez o intoxicación **no es suficiente** ni para exonerar ni para rebajar la calificación del delito. *Pueblo v. Méndez Ramos*, 108 DPR 59, 62 (1978).

La Dra. Ruth E. Ortega Vélez recoge lo establecido por nuestro alto foro y comenta sobre el Artículo 42, *supra*, lo siguiente:[37]

> La embriaguez y la narcomanía voluntaria **no eximen de responsabilidad**. Respecto a la embriaguez voluntaria, Juan C. Aguinaga distingue entre el bebedor habitual y el alcohólico crónico ya que este último padece un estado patológico por lo cual es un enfermo mental.
> …
> La embriaguez voluntaria tiene que ser de tal grado o carácter **que inhiba en el acusado su facultad mental para formar la intención específica requerida** por el Código para la convicción de un delito- o grado del mismo- **en el cual se requiere tal intención específica**, y que la determinación de ese hecho es esencialmente una para el jurado o la corte juzgadora. La determinación respecto a si la embriaguez voluntaria afecta o inhibe la facultad mental del acusado **para formar la intención requerida** para la configuración del delito, **es una determinación de hecho que tiene que hacerse por el juzgador de los hechos**.
> …

---

[36] Véase también, *Pueblo v. Febres*, 78 DPR 893, 899 (1956).

[37] Véase, Dra. Ruth E. Ortega Vélez, *Código Penal de Puerto Rico 2012,* Enmendado por la Ley Núm. 246-2014, ediciones SITUM, 2017, a las págs. 70-72. [notas al calce omitidas]

Apuntalamos que la jurisprudencia previa al Código Penal vigente precisó que este hecho es uno que debe ser determinado por el jurado o el juzgador de los hechos, luego de sopesar las circunstancias relacionadas con el delito y la evidencia pericial sometida. *Pueblo v. Belmonte Colón*, supra, a la pág. 86; *Pueblo v. Rivera*, supra, a las págs. 573-574.

**El concepto de duda razonable**

La Constitución de Puerto Rico garantiza el derecho de todo acusado en procesos criminales a gozar de la presunción de inocencia. Art. II, Sec. 11, Const. ELA, LPRA, Tomo I. Para poder rebatir esa presunción, se exige que el Estado presente prueba, más allá de duda razonable, sobre todos los elementos del delito y su conexión con el acusado. *Pueblo v. García Colón I*, 182 DPR 129, 174 (2011); *Pueblo v. Santiago et al.*, 176 DPR 133, 142 (2009); *Pueblo v. Irizarry*, 156 DPR 780, 786 (2002); *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000).

Cónsono con lo anterior, la Regla 110 de las de Procedimiento Criminal, 34 LPRA Ap. II, R. 110, dispone, en lo pertinente, que "[e]n todo proceso criminal, se presumirá inocente al acusado mientras que no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá...". Para cumplir con ese rigor probatorio, nuestro sistema de justicia criminal requiere que la prueba que presente el Ministerio Público sea suficiente en derecho, lo que significa que la evidencia presentada tiene que producir certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. Rosario Reyes*, 138 DPR 591, 598 (1995); *Pueblo v. Cabán Torres*, 117 DPR 645, 652 (1986); *Pueblo v. Carrasquillo Carrasquillo*, 102 DPR 545, 552 (1974).

Lo anterior, no implica que la culpabilidad del acusado tenga que establecerse con certeza matemática. La duda razonable

tampoco se refiere a especulaciones del juzgador, sino que es una duda fundada que surge como producto del raciocinio de todos los elementos de juicio presentes en el caso. *Pueblo v. Bigio Pastrana*, 116 DPR 748, 761 (1985); *Pueblo v. Cruz Granados*, 116 DPR 3, 21-22 (1984). Además, para justificar la absolución de un acusado, la duda razonable debe surgir de manera serena, justa e imparcial, luego de que el juzgador considere la totalidad de la evidencia del caso o de la falta de suficiente prueba que apoye la acusación. *Pueblo v. Soto González*, 149 DPR 30, 43 (1999). En conclusión, la duda razonable es la insatisfacción de la conciencia del juzgador con la prueba presentada. *Pueblo v. Cabán Torres, supra*, a la pág. 652.

**Apreciación de la prueba y estándar de revisión apelativa**

Por último, cuando estamos ante una revisión en la esfera criminal, nuestro Tribunal Supremo ha establecido que los foros apelativos no debemos olvidar que el juzgador de los hechos en primera instancia está en especial ventaja al momento de aquilatar la prueba y los testimonios presentados. *Pueblo v. De Jesús Mercado*, 188 DPR 467, 477-478 (2013); *Pueblo v. Rosario Reyes*, supra, a la pág. 598 (1995). Por tanto, la apreciación hecha a ese nivel merece gran respeto. *Pueblo v. Rodríguez Pagán*, 182 DPR 239, 259 (2011).

El Tribunal Supremo en *Pueblo v. Irizarry*, supra, a las págs. 788-789, reiterado en *Pueblo v. Casillas, Torres*, 190 DPR 398, 416 (2014) expresó:

> [E]n el ejercicio de tan delicada función revisora, no podemos abstraernos de las limitaciones que rigen el proceso de evaluación de la prueba por parte de un tribunal apelativo. Al enfrentarnos a la tarea de revisar cuestiones relativas a convicciones[sic] criminales, siempre nos hemos regido por la norma a los efectos de que la apreciación de la prueba corresponde, en primera instancia, al foro sentenciador [...].

De igual manera, esta doctrina de deferencia judicial no es absoluta y cede ante las posibles injusticias que pueda acarrear las determinaciones de hechos que no estén sustentadas por la prueba desfilada ante el foro primario. Los tribunales apelativos solo

intervenimos con la apreciación hecha cuando se demuestre satisfactoriamente la existencia de pasión, prejuicio, parcialidad o error manifiesto. *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 63 (1991). Es ante la presencia de alguno de estos elementos, o cuando la apreciación de la prueba no concuerde con la realidad fáctica, o sea inherentemente increíble o claramente imposible, es que intervendremos con la apreciación formada. *Pueblo v. Irizarry*, supra, a la pág. 789; *Izagas Santos v. Family Drug Center*, 182 DPR 463, 485 (2011). Además, cuando la evidencia directa de un testigo le merece entero crédito al juzgador de hechos, ello constituye prueba suficiente de cualquier hecho. *Rivera Menéndez v. Action Services*, 185 DPR 431, 444 (2012).

De otro lado, es axioma judicial que ante la prueba pericial y documental el foro apelativo se encuentra en igual posición que el foro primario y, por tanto, está facultado para apreciar la prueba apoyándose en su propio criterio. *Dye-Tex de P.R., Inc. v. Royal Ins. Co. P.R.*, 150 DPR 658, 662 (2000). Esto significa que este tribunal está en igual posición que el foro primario para apreciarla y evaluar directamente la prueba pericial y formular, en base a esta, nuestras propias determinaciones de hechos. *Rivera v. Pan Pepín*, 161 DPR 681, 687 (2004).

El valor probatorio del testimonio pericial está subordinado al análisis de determinados factores, entre los cuales se encuentran: "(a) Si el testimonio está basado en hechos o información suficiente; (b) si el testimonio es el producto de principios y métodos confiables;(c) si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso; (d) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica; (e) las calificaciones o credenciales de la persona testigo, y (f) la parcialidad de la persona testigo." Regla 702 de las de Evidencia, 32 LPRA Ap. VI, R. 702; *S.L.G. Font Bardón v. Mini-*

*Warehouse*, 179 DPR 322, 343-344 (2010); *Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R.*, supra, a la pág. 664. Estudio que a su vez tiene que estar asentado en un examen independiente de la prueba desfilada y no a base de los hechos que exponen las partes. *Hernández v. San Lorenzo Const.*, 153 DPR 405, 424-425 (2001).

Por último, es una norma reiterada en nuestra jurisdicción que "el juzgador de hechos no está obligado a aceptar las conclusiones de un perito". *Pueblo v. Montes Vega*, 118 DPR 164, 170-171 (1986); *Pueblo v. Marcano Pérez*, 116 DPR 917, 928 (1986). Por lo tanto, si luego de evaluar el testimonio pericial, el juzgador concluye que no merece credibilidad, tendrá la facultad de rechazarlo. *S.L.G. Font Bardón v. Mini-Warehouse*, supra, a la pág. 346.

**III.**

En síntesis, el apelante cuestionó la apreciación de la prueba realizada por el foro de primera instancia, pues entiende que la misma <u>no fue suficiente para demostrar su culpabilidad más allá de duda razonable</u>. En los errores señaló que la prueba estableció las causas de **exclusión de responsabilidad penal** y que actuó por *error de tipo* sobre los elementos de los delitos. El apelante, además, indicó que el foro apelado erró al concluir que este no se encontraba intoxicado al momento en que ocurrieron los hechos. Por estar los errores relacionados entre sí, los discutiremos conjuntamente.

**a.**

A manera de resumen, y como introducción al marco doctrinal de nuestro análisis, reiteramos que los principales **elementos subjetivos** de la ofensa son la intención y la negligencia. A su vez, la intención tiene tres modalidades: a propósito, con conocimiento y temeridad. En términos generales, se actúa con propósito cuando el **objetivo consciente** es la producción de un resultado, y actúa con conocimiento cuando se **está consciente** de la producción del

resultado es una consecuencia prácticamente segura de su conducta. Recordamos que "a sabiendas" es sinónimo de "con conocimiento" y no requiere el **conocimiento de la ilegalidad** del acto u omisión.

Por otro lado, es la teoría del apelante que dado su severo estado de intoxicación voluntaria no estaba consciente de lo que hacía por lo que no actuó ni a propósito ni con conocimiento. En otras palabras, este no puede ser castigado penalmente, ya que los hechos fueron realizados *sin intención* criminal. Adelantamos que no le asiste la razón.

El Artículo 42 del Código Penal de 2012, *supra*, es claro al indicar que la prueba de intoxicación voluntaria **no es admisible** para establecer que la persona se encontraba **en un estado de inimputabilidad,** ni tampoco para negar que la persona intoxicada actuó temeraria o negligentemente. Ahora bien, el segundo párrafo señala que dicha prueba **sí es admisible para negar** que la persona intoxicada actuó a propósito o con conocimiento. Apuntalamos que este artículo aún no ha sido interpretado por nuestro Tribunal Supremo. Sin embargo, el Profesor Chiesa indica que dicha prueba solo sirve para negar un elemento subjetivo de la ofensa **cuando se trata de intención específica**.

Es decir, dicha prueba es admisible si se pretende utilizar para negar la existencia de un elemento subjetivo distinto a la intención. Por otro lado, la Profesora Dora Nevares entiende que dicha prueba puede operar como causa de inimputabilidad. No obstante, ambos están contestes en que **la misma solo es admisible para delitos de intención específica**.

El Código Penal de 2012 no menciona el aspecto de intención específica. Sin embargo, y como ya indicamos, hay delitos que requieren elementos subjetivos adicionales a la intención, lo cuales por su tipo requieren un estado mental distinto. Estos eran antes

conocidos como delitos de intención específica. Por tanto, a pesar de que el Código Penal de 2012 no utiliza dichos términos, **continúan presentes en nuestro ordenamiento penal**. Aclarado este asunto, nos corresponde analizar si en el presente caso los delitos imputados son de intención general o específica. Es decir, debemos analizar los elementos subjetivos de las ofensas imputadas y si estos requieren elementos subjetivos adicionales.

En lo aquí pertinente, los *elementos objetivos* del tipo (violación de morada), conforme dispone el Artículo 170, *supra*, son: (1) que la persona se **introduzca**, o se **mantenga** en una casa o edificio ocupado **ajeno**, en sus dependencias o en el solar en que esté ubicado, (2) **sin el consentimiento o contra la voluntad expresa del morador** o de su representante, y (3) o que penetre en ella **clandestinamente**. De una lectura de este precepto surge que estamos ante dos elementos o tipos: de conducta y de resultado. Como vemos, el delito de violación de morada no requiere la intención de realizar un acto ulterior o determinada circunstancia concomitante. Este delito, **distinto** al delito de escalamiento, **no requiere un elemento subjetivo adicional** (motivo) para desmostar la intención. En este aspecto podemos afirmar que dicho delito es uno de <u>intención general</u>.

De igual manera, examinados los elementos objetivos de los restantes delitos imputados, *Daños Agravado*, *Alteración a la Paz* y *Tentativa de Agresión*, debemos concluir que estos son también de intención general. Así las cosas, la alegada prueba de intoxicación voluntaria **no es admisible** para plantear que el señor Greennough Flaherty no tenía la intención de cometer delito alguno. Por ende, no es correcta la aseveración del apelante al indicar que "[l]a evidencia sobre la intoxicación no era más que evidencia adicional para

explicar que Macdara no sabía", es decir **no tenía el conocimiento ni la intención de cometer delito alguno**.[38]

En relación a la prueba de intoxicación voluntaria, es importante establecer que durante el juicio no se presentó una prueba toxicológica. Sin embargo, de los testimonios vertidos durante el juicio, surge que el Agente de la Policía afirmó que el señor Greennough Flaherty "estaba borracho". Asimismo, el señor Brian Castillo, Oficial de Seguridad de St. James, declaró que estaba bajo los efectos de "una sustancia", que su comportamiento era "raro" y "errático", "fuera de lo común". Por su parte, la señora Gilmore testificó haber encontrado una botella de vino en el garaje que no era de ella, y en el video se puede apreciar que el señor Greennough Flaherty tenía una botella en su mano izquierda.[39] "Él claramente estaba bebiendo".[40] Asimismo, y aunque expresó que el apelante "estaba borracho", aclaró que "no sé lo que tenía en su sistema, solo lo digo por sus acciones."[41] En cuanto a estos testimonios el foro apelado señaló en corte abierta que los testigos indicaron que el apelante parecía fuera de sí, pero ninguno conocía a este caballero, ni pudieron indicar que estaba intoxicado. Por tanto, su valor probatorio para efectos de acreditar la intoxicación fue insuficiente.

Por otro lado, mediante prueba pericial, la Dra. Cynthia Casanova Pelosi concluyó que el nivel de intoxicación del apelante era severo, de más de .17 a .30 de volumen del alcohol en la sangre.[42] La perito declaró que el señor Greennough Flaherty le indicó "que camino a casa de su amiga Grace, aparentemente reconoció su casa, se metió allí y pasó lo que pasó."[43] Añadió que,

---

[38] Véase, *Alegato de Apelación Criminal*, a las págs. 20-21.
[39] Véase, TPO del 29 de noviembre 2023, a las págs. 46-47.
[40] *Íd.*, a la pág. 124.
[41] *Íd.*, a la pág. 123.
[42] Véase, TPO del 30 de noviembre de 2023, a las págs. 57-58.
[43] *Íd.*, a la pág. 58.

"el apagón alcohólico le comenzó cuando sale del restaurante, … que está caminando, que va con tres cuartas botella de vino y sigue tomando en el camino, ahí fue que empieza el apagón."[44] Recordamos que, en cuanto a este testimonio, esta *Curia* se encuentra en igual posición que el foro primario y su valor probatorio está subordinado al análisis de determinados factores.

Así pues, conforme al derecho antes expuesto, concluimos que el valor probatorio de la referida prueba pericial es escaso.[45] Asimismo, ocurre con los testimonios de los testigos del Ministerio Público, según detallamos. En este punto, precisa recalcar que la intoxicación voluntaria no constituye una causa de inimputabilidad ni es admisible para negar un elemento subjetivo distinto a la intención, como ya hemos explicado. En los delitos aquí imputados no es necesario constatar que al realizarse la acción el sujeto albergaba un estado mental adicional a la intención. Incluso, si lo fuera, ni de los videos admitidos en evidencia ni de los testimonios vertidos en el juicio, surge que la intoxicación voluntaria fuese de tal grado o carácter que inhibió en el apelante su facultad mental para formar la intención. Asimismo, el Ministerio Público no venía obligado a ofrecer prueba pericial para refutar la alegada defensa de intoxicación voluntaria. Por ende, en el caso de autos, el foro apelado no estaba obligado a aceptar las conclusiones de la Dra. Cynthia Casanova Pelosi. *Pueblo v. Marcano Pérez*, supra, pág 928. Así pues, la opinión e inferencias fue un asunto de credibilidad que dirimió el juzgador de los hechos.

---

[44] *Íd.*, a la pág. 72.

[45] El Procurador hizo hincapié en el hecho de que durante el juicio **no se presentó prueba del grado de intoxicación del apelante**. "Lo más cercano a ello fue el testimonio de la doctora Casanova Pelosi quien declaró que- en las entrevistas que le hizo al apelante- *este le dijo a ella* que había consumido una gran cantidad de alcohol, drogas y medicamentos horas y minutos antes del incidente. Es decir, *convenientemente*, el señor [Macdara] le aseveró a la doctora que ese día estaba tan y tan intoxicado que no se acuerda de nada de lo que había ocurrido en la residencia de la señora Gilmore. No obstante, esa hipótesis, además de ser prueba de referencia, **no** es más que un cuento mal contado." Véase, *Alegato del Pueblo* a la pág. 25. [Énfasis, subrayados e itálicas en el original]

En virtud de ello, y examinada cuidadosamente la prueba presentada; así como estudiado el derecho aplicable, consideramos correctas las expresiones de la Hon. María Zoraida Ferraiuoli. Luego de que las partes realizaran sus argumentos finales, la jueza emitió un fallo de culpabilidad e indicó:[46]

> Bien. Si bien el Tribunal tiene que tomar en consideración lo que se presenta en Sala como en derecho. En este caso no se presentó una defensa de inimputabilidad. Lo que está pidiendo la defensa es que interprete que el caballero que está [ininteligible] voluntaria, para alegar que él actuó a propósito o con conocimiento. En base de lo que se presentó en Sala como evidencia, sí tenemos el informe de la perito, Cynthia Casanova Pelosi, que indica su posición en cuanto a un relato que se le hace. Y como indicamos, al final **eso es a interpretación judicial**, si esa persona estaba intoxicada o no para fines de con conocimiento, a propósito, y ella recuenta los detalles que le indica el propio caballero acusado, los padres, que recuerda detalladamente a extremos todo lo que sucedió ese día hasta el punto de que comienzan los actos que se imputan al caballero.
>
> Eh, además de eso, nosotros tuvimos ante nuestra consideración testimonios. Y los testimonios indicaron que la persona parecía fuera de sí, pero ninguno conocía a este caballero, ni pudieron indicar que estaba intoxicado. No hay prueba científica a detalle, y es importante que este Tribunal **sí tuvo ante sí, a su consideración videos** que fueron tanto sustantivos como ilustrativos, porque hubo participación que las persona pudieron ilustrar, y hay **videos donde estaba el acusado que hablan por sí solos**. Este Tribunal que (ininteligible) **credibilidad a los testigos** y le pidió una (ininteligible) porque son detallados. Eh, no vimos que el caballero tambaleara, no vimos que el caballero balbuceara, se quitó los zapatos con agilidad y se los volvió a poner con agilidad. Pudimos ver comportamiento que, aunque, verdad, por lo que surge era que el caballero estaba desorientado, pero **no parecía una persona que estaba completamente desorientada, cayéndose, balbuceando**. Y, de hecho, él, cuando llega la Policía, que el caballero se calma y comienza a seguir instrucciones, lo cual nosotros entendemos que se probaron todos los elementos del delito, eh, su condición [conexión] con el imputado, más allá de duda razonable y con una determinación de que el caballero es culpable por todos los delitos que se le imputan. […][Énfasis nuestro]

**b.**

Concluido el análisis sobre el elemento subjetivo de la intención, corresponde determinar si el Ministerio Publico demostró, más allá de duda razonable, los elementos objetivos de cada delito.

---

[46] Véase, TPO del 30 de noviembre de 2023, a las págs. 115- 117.

Como ya señalamos, los *elementos objetivos* del delito de violación de morada, conforme dispone el Artículo 170, *supra*, son: (1) que la persona se **introduzca**, o se **mantenga** en una casa o edificio ocupado **ajeno**, en sus dependencias o en el solar en que esté ubicado, (2) **sin el consentimiento o contra la voluntad expresa del morador** o de su representante, y (3) o que penetre en ella **clandestinamente**.

Examinada la TPO; así como observados los videos admitidos en evidencia, surge con meridiana claridad que el señor Greennough Flaherty entró y se mantuvo intencionalmente en la residencia núm. 357 de la Urbanización Dorado Beach sin el consentimiento de la señora Gilmore, quien era la persona que allí moraba. Este tuvo acceso por la terraza, encendió las luces y rompió una puerta de cristal para entrar a su interior. Incluso, en uno de los videos captados con el celular de la señora Gilmore, esta **expresamente** le indicó al acusado que había irrumpido en su hogar (*you broke into my house*) a lo cual este se ríe de forma burlona y le grita *puta*. Asimismo, aun cuando llegaron los oficiales de seguridad, este pretendió continuar dentro de la casa en desafío a estos.

Como surge del derecho antes consignado, el apelante solo podía tener como "objetivo consciente" **entrar o mantenerse en una casa ajena sin el consentimiento expreso del morador** o clandestinamente. Lo cual sin duda alguna quedó claramente demostrado.

En cuanto a la "ajenidad" de la casa o edificio, como indicó el profesor Chiesa, **es una situación de hecho** que existe o no existe. Por ende, era un hecho que el señor Greennough Flaherty debió o no conocer. Así pues, en cuanto al elemento de si la residencia núm. 357 era ajena, destacamos fue **un hecho estipulado** que el Sr. Lucio Base adquirió la propiedad el 28 de febrero de 2022, por compraventa a la Sra. Sarah Greene, madre del apelante. Por ende,

estipulado que la propiedad era del Sr. Lucio Base y no del apelante, quedó probada la circunstancia concomitante de que la residencia a la cual entró era ajena. Es decir, se estipuló y se demostró que la vivienda pertenecía a otra persona desde hacía varios meses antes de los hechos y el apelante **no presentó prueba en contrario**. Asimismo, apuntaló el Procurador, y concurrimos con ello, que es *absurdo por demás* creer que luego de nueve (9) meses de vendida la casa, aún creyera que era suya. A su vez, es prueba impertinente para establecer que el apelante desconocía este hecho, el que estuviese borracho o intoxicado voluntariamente con alguna sustancia. Los tribunales no tenemos que creer lo que nadie creería. *Pueblo vs. Acevedo Estrada*, supra.

Más aún, como señaló el Procurador, en el juicio no se probó **ningún error en cuanto a la ajenidad** de la residencia. El error sobre el tipo dispuesto en el Artículo 29, *supra*, es aquel que recae sobre los elementos constitutivos del delito. Reiteramos que la circunstancia concomitante de la ajenidad es un hecho que existe o no existe. En el presente caso, dicho hecho se estipuló por lo que no admitía prueba en contrario. Destacamos, además, que en el recurso apelativo el apelante argumentó que no actuó "con conocimiento" de que la propiedad y la morada **eran ajenos, ya que este creyó que eran suyos**. Del derecho antes explicado, surge que el señor Greennough Flaherty solamente podía tener o no conocimiento de la existencia de dicha circunstancia, mas no podía tener como "propósito" o como "su objetivo consciente" su existencia. En conclusión, resulta ser contrario a derecho argumentar que el apelante no tuvo la intención de entrar a una casa ajena por el mero hecho de creer que era suya sin prueba que así lo establezca.

En resumen, la prueba estableció que el apelante entró intencionalmente a una casa ajena, de manera clandestina (al

romper la puerta de cristal de la terraza) y sin la autorización de la señora Gilmore. Así pues, reiteramos que quedó claramente demostrado que este **entró a una casa que no era la suya** e incluso **se le advirtió que no era su casa.** De esta manera, concluimos que el Ministerio Público probó más allá de duda razonable todos los elementos del delito de violación a morada y los del delito de Daño Agravado.

Por su parte, puntualizamos que respecto al daño no cabe duda de que intencionalmente el apelante rompió (destruyó) una puerta de cristal de la terraza para entrar al interior de la residencia y se estipuló que su valor sobrepasó los $560, modalidad del daño agravado.

**c.**

En relación con el delito de alteración a la paz, el apelante arguye que las palabras soeces se realizaron en la calle y al momento en que se realizaron "nadie estaba en paz". Entiende que no existe prueba del estado mental de la señora Gilmore al momento en que se realizaron las "expresiones" o "vituperios". Indicó; "[l]a denuncia por el delito de alteración a la paz, no es más que un intento de sobre criminalizar una conducta que ya estaba comprendida en las otras denuncias."[47]

Como surge del Artículo 241, *supra*, el delito de alteración a la paz tiene dos modalidades; cuando el acto afecta el derecho a la intimidad de la persona en el hogar, y cuando se producen palabras o expresiones ofensivas o insultantes en un lugar donde quien las oye tiene una expectativa razonable de intimidad. Evidentemente, uno de los elementos objetivos del delito de alteración a la paz, es que **la víctima se encuentre en paz al momento de la comisión del delito**. Seguidamente, en cuanto a la segunda modalidad, el

---

[47] *Íd.*, a la pág. 22.

Ministerio Público tenía que probar que el señor Greennough Flaherty inició y dirijió **los insultos a la señora Gilmore** y que, a causa de esos insultos, la paz o tranquilidad de esta fue efectivamente alterada.

La señora Gilmore testificó que, el 25 de noviembre de 2022, a las 10:00 pm estaba sola en la casa **viendo televisión** cuando escuchó un ruido y salió corriendo a la parte de atrás de la casa. Se encerró en el cuarto y llamó a la seguridad de Dorado Beach.[48] Cuando estos llegaron, para salir de la residencia, tuvo que pasar por varios cuartos, y al llegar a su cuarto se percató que el apelante estaba allí medio desnudo e iba atacarla. "… no sabía si venía a violarme, a matarme, no sabía nada."[49] Acto seguido comenzó a gritar: "He's here, He's here." *Íd.* Dos hombres de seguridad llegaron y lo restringieron.[50] "Se lo llevaron al pasillo, siguieron forcejeando. Él trato de salirse de ellos y venir hacia donde mí."[51] "Mientras se lo llevaban, él seguía forcejeando y peleando con la Seguridad. Y, además, me estaba gritando, me decía palabras soeces, que si "puta", que si "te voy a matar".[52]

La señora Gilmore manifestó que, mientras intentaba llamar al 911, el señor Greennough Flaherty logró escaparse y entrar a la residencia de nuevo. "Tan pronto él logró entrar a la casa, los de Seguridad fueron de nuevo a buscarlo. Yo **me fui a una esquina a esconder** junto a la casa."[53] Luego salió y vio al señor Macadara golpeando en la sala de la casa a uno de los empleados de Seguridad.[54] "Yo nunca había presenciado un acto tan violento. Así que corrí lo más rápido que puede."[55] "Corrí al patio de mis vecinos

---

[48] Véase, TPO del 28 de noviembre, a la pág. 51.
[49] *Íd.*, a la pág. 53.
[50] *Íd.*, a la pág. 54
[51] *Íd.*, a la pág. 57, líneas 3-5
[52] *Íd.*, líneas 22-25.
[53] [Énfasis nuestro]. *Íd.*, a la pág. 58
[54] *Íd.*, a la pág. 59.
[55] *Íd.*, a la pág. 60, líneas 9-10.

y me escondí en las matas."[56] Testificó que luego de 15 minutos el apelante salió de la casa, le gritó que la encontró y le dijo puta.[57] Los de seguridad nuevamente corrieron a donde él, lo retuvieron "y lo traen de nuevo para la residencia." *Íd.*

La señora Gilmore continuó declarando que se quedó fuera de la casa esperando que llegara la policía. "Luego de 15 a 20 minutos, nuevamente el señor Macdara logra liberarse e iba caminando por la calle gritando."[58] Los de Seguridad trataron de alejarlo de mí lo más posible porque sabían que yo estaba todavía en las plantas, en las matas, escondiéndome." *Íd.* "Gracias a Dios en ese momento todavía estaban los de Seguridad, porque él seguía tratando de lanzarse sobre mí."[59] Entonces, comenzó a grabarlo con el celular, "... aunque yo estaba aterrorizada..."[60] "Estaba gritándome que yo era una puta ... y que nada lo va a parar, y que él me mataba si podía."[61] Declaró que el señor Macdara siguió "tratando de atacarme" y escapándose de los dos guardias de Seguridad. "Ellos estaban entre nosotros en todo momento" *Íd.* Mientras esto ocurría el señor Greennough Flaherty le gritó *cunt*, lo que quiere decir *bicha* según surge de la TPO.[62]

El Agente de la Policía, Juan José Collazos Rolón testificó que, al llegar a la casa, luego de que el acusado fue restringido por los de Seguridad, la señora Gilmore todavía se encontraba un poco nerviosa.[63] Posteriormente, llegó la Policía y el señor Greennough Flaherty fue arrestado.

---

[56] *Íd.*, líneas 15-16.
[57] *Íd.*, a la pág. 61.
[58] *Íd.,* a la pág. 62.
[59] *Íd.*, a la pág. 63.
[60] *Íd.*, a la pág. 66.
[61] *Íd.*, a la pág. 68.
[62] *Íd.*, a la págs. 69-70. Britannica Dictionary definition of *Cunt*: a woman's sexual organs, is used as an offensive way to refer to a woman. Used as an offensive way to refer to a stupid or annoying person. Cunt is an extremely offensive word in all of its uses and should be avoided. Véase, https://www.britannica.com/dictionary (última visita 21 de diciembre de 2024).
[63] Véase, TPO del 30 de noviembre de 2023, a la pág. 17.

Por ende, de la evidencia presentada surge diáfanamente que el apelante perturbó con su conducta ofensiva la paz y tranquilidad de la señora Gilmore. Cuando este comenzó con sus acciones ella se encontraba viendo televisión tranquilamente en su residencia. Además, ya alterada la paz en la intimidad de su hogar, el señor Greennough Flaherty le gritó palabras soeces tales como prostituta (*whore*), y puta (*bitch*). El video presentado en evidencia demuestra la actitud desafiante y ofensiva del apelante al manifestar dichas palabras insultantes. También dichas palabras insultantes fueron proferidas tanto dentro de la casa como fuera de esta. Como consignamos, esta declaró estar aterrorizada. En consecuencia, se probaron los elementos de este delito más allá de duda razonable. Enfatizamos que quien único alteró la paz de la señora Gilmore, incluso antes de proferirles la palabra insultantes, fue el propio apelante.

**d.**

Respecto al delito de agresión en su modalidad de tentativa, argumentó el apelante que "[l]a única acción especifica que la testigo describe es que Macdara corrió hacia ella. El que intentaba atacarla **no es más que una inferencia** no sustentada por la conducta de forma inequívoca, como requiere el delito. Correr no es una acción inequívoca e inmediatamente dirigida a la consumación del delito de agresión, como se exige en la modalidad de tentativa. Correr hacia alguien no implica golpear ni agredir, se necesitaba alguna actuación adicional del sujeto para configurar la tentativa de agresión."[64]

Como expusiéramos, el Artículo 35, *supra*, define la tentativa: cuando la persona actúa con el propósito de producir el delito (en este caso la agresión) y la persona realiza acciones inequívocas e

---

[64] Véase, *Alegato de Apelación Criminal*, a la pág. 23. [Énfasis nuestro].

inmediatamente dirigidas a su consumación, lo cual no se logra por circunstancias ajenas a su voluntad. A su vez, la agresión requiere como elemento, que, por cualquier medio o forma, se cause a otra una lesión a su integridad corporal. Del testimonio de la señora Gilmore antes consignado, surge claramente que el señor Greennough Flaherty intentaba agredirla pero que no lo logró, ya que los guardias de Seguridad se mantuvieron evitando que este se le acercara. Tanto ella, como el Sr. Brian Castillo[65] manifestaron durante el juicio que el apelante se encontraba agresivo. Reiteramos que, de los videos presentados en evidencia, se puede apreciar lo agresivo que se encontraba el apelante al dirigirse hacia la señora Gilmore. Por lo que, es forzoso concluir que quedó demostrado más allá de duda razonable que el apelante cometió el delito de tentativa de agresión. Puntualizamos que cualquier evidencia directa de un testigo que merezca entero crédito es suficiente para probar cualquier hecho. Regla 110 (D) de las de Procedimiento Criminal, 34 LPRA Ap. VI, R. 110 (D).

**e.**

Subrayamos que los foros apelativos no debemos obviar que el juzgador de los hechos en el foro de primera instancia está en especial ventaja al momento de aquilatar la prueba y los testimonios presentados. Por lo cual, su apreciación de la prueba merece gran respeto. Los tribunales apelativos solo intervenimos condicho proceder cuando se demuestre satisfactoriamente la existencia de pasión, prejuicio, parcialidad o error manifiesto. Lo cual no están presentes en este caso. Asimismo, de la prueba presentada durante el juicio surge que el Ministerio Publico cumplió con su carga probatoria. Igualmente, cuando la evidencia directa de un testigo le

---

[65] Véase, TPO del 29 de noviembre de 2023, a la pág. 142, línea 2.

merece entero crédito al juzgador de hechos, ello constituye prueba suficiente de cualquier hecho.

En conclusión, los errores imputados no fueron cometidos por el foro *a quo.*

**IV.**

Por los fundamentos antes expuestos, se confirma la *Sentencia* apelada.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


                          LCDA. LILIA M. OQUENDO SOLÍS
                          Secretaria del Tribunal de Apelaciones